Case number 19-4004, Infinity Capital LLC et al. v. Francis David Corporation. Arguments not to exceed 15 minutes per side. Mr. Unger, you may proceed for the appellant. Thank you very much, sir. Good afternoon. May it please the court, my name is Mike Unger and I represent the appellant, Electronic Merchant Systems. We've made arrangements and I would like to reserve two minutes for rebuttal. You may, thank you. Thank you, your honor. The trial court made several clear errors requiring reversal. The 2006 contract at issue in this case was negotiated at length by sophisticated parties and choice was represented by experienced sophisticated counsel. The parties were free, we submit, to agree that choice would not solicit EMS merchants and likewise the parties were free to negotiate and agree that choice's rights to residual payments from EMS were expressly conditioned on its own compliance with this obligation not to solicit EMS merchants. As with most contracts, we submit that this to give full meaning and effect to all of its terms, not struck down the way it was. Can I ask you a question about the 2016 change and I'm curious of what your position is. Why did 4.1-2 change from the verb terminate to the verb phrase reduce or discontinue? Is there anything in the record on, was that a standard form contract change according to you or was there a reason behind that? Yes, the reason behind that was explained by Mr. O'Neill, choice's CFO and respectfully, your honor, I would call careful lawyering, admittedly, some belt and suspenders. There's admittedly some redundancy between Romanette 1 and Romanette 2, but as Mr. O'Neill explained during trial and this was uncontested, Romanette 2 contemplates a different situation than a pure solicitation. Romanette 2 represents the potential situation where someone, a competitor, remember what's happening, as your honor notes, what's happening in 2016 that gives rise to this dispute. As choice has said, we no longer wish to be your agent. We want to go up to the big leagues and we want to be a processor ourselves. So, they're essentially going to go from being an exclusive agent to being a competitor of EMSs. So, at that point, what we wanted to be sure of was that they not only honored the non-solicit, but also, we're not going to go out there and say things of a disparaging nature or of a nature that would cause someone to start lowering the volume, the processing volume that they were doing with EMS. So, that was the reason for that language. Again, admittedly, there is some and given full meaning and a fact where possible to all of their terms and we, again, submit that it was clear error for the trial. Well, counselor, I'm struggling with relying on Mr. O'Neill's testimony about those two subsets. Isn't that, in fact, extrinsic evidence? Well, even if it, good question, your honor, and even if it was extrinsic evidence and parole evidence, we struggled with that at trial. I got to be honest with you because I think that this language is clear and declarative on its face. A client walked in and presented this language to me and said, what do you think? You think I should go out and solicit or you think I should go out and disparage or try to move any business away from me? I understand there's a struggle. The problem for me is, you know, there's admission today and in the briefing that they largely overlap. And now you're, in order to get to your extrinsic evidence, we have to make a determination that there was some ambiguity or you don't get your extrinsic evidence nor does the other side. So to look at Mr. O'Neill's testimony, then we have decided that there's ambiguity there and you've conceded that there's overlap. So I'm struggling with how we make a determination whether that ambiguity is merely boilerplate redundancies, as you would say, or whether it is in fact a true ambiguity that needs to be interpreted by all extrinsic evidence. How do you draw that distinction? Yeah, and I say either way, it comes down in my client's favor. If you, and I was trying to respond to Judge Murphy's question in drawing on what Mr. O'Neill testified to, Your Honor, I do not believe that we need to resort to extrinsic parole evidence in order to apply this contract. I think the language was clear and declarative on its face and could have been easily interpreted and adjudicated on a summary judgment standard. I see no inconsistency with this. Again, and the way I respond to Your Honor's question is this. I think that you are seeing good, careful lawyering going on here. Romanet 4.1 and Romanet 2 is just making it perfectly clear that in addition to your inability to go out and solicit, if you want to get those residuals, you can't go out and you can't solicit and you can't do anything else to damage these extremely valuable customer-merchant relationships that EMS has with its merchants. You can't do either of them, and I think that all it's doing is making that exquisitely clear to anyone who would read Section 4 involving the agent covenants to EMS. Going back to the point that I made before, I think that if you choose to do so, and remember, their whole brief is written in the sense that it's complete with all these gotcha moments. We're not talking about gotcha moments here. This isn't a gotcha moment. We're talking about discovery revealing to us that there were 164 independent solicitations by choice. That's not a gotcha moment. That's not an accident. The fact that they didn't translate each of those solicitations into actual business and only signed up 72 of them, which in and of itself is also a breathtaking number. Or even if you go to what the trial court found and said, well, even if you apply only Romanet II to this, where you have to show that the business actually was moved, reduced, or discontinued, the trial court found in 19 separate circumstances that it happened. It's a little bit like, are you drowning in 9 feet of water or 1,000 feet of water? It really doesn't matter. At that point in time, they are in clear violation. Why they did that is something for my adversary to answer. Who would do that? Getting back to the superfluity argument, frankly, I compared the 2016 contract to the 2010 contract. The superfluity concern or notion or idea was clearly in the 2010 contract as well. The changes really didn't do much. I don't know if this helps you or hurts you, but it seems like it was there all along. And then in 2016, I get the idea that you were trying to eliminate the exclusivity component to it. But the non-solicitation was still there. And then all you changed really in the non-solicitation provision was the verb terminate was changed to reduce or discontinue. And I suppose, I guess, you answered my question by suggesting that reduce was added because with the exclusivity gone was the concern that he could just move business rather than discontinue business. And you didn't have that concern before? Did you not have that concern before 2016? You know, I'm going to be honest with you, Judge. I don't know what the concern was before the 2016 amendment came into place. But I do know, again, resorting to what I heard at trial, I do know why that language was deemed to, I probably should have said it this way, was deemed to continue to be important to my client. And again, while there may be some overlap, at no point in time can it be said, in my view, that those terms are in any way inconsistent. The worst thing that you could say about them is that it is good, smart, careful lawyering and a belt and suspenders approach. And the language that was deployed by the author was clear and declarative and in addition, this is the court knows from the record, this was the subject of much discussion, much redlining going back and forth and back and forth. And the fact that that choice actually understood exactly what was in there is manifested materially. So in two important respects, first is the fact that when choice wanted to go out and solicit on certain occasions, but certainly not ever, everyone, because we had to learn about most of this through discovery, it came and it asked permission. Who does that? Why would you ask for permission if you didn't think you were contractually prohibited? Let me ask you, counselor, if someone asks, if that's the argument and then someone asks you for permission, why would you not answer? Because there are a number of circumstances and as I understand it, where you were asked that question and rather than saying, of course not, we never allow that or in this unusual circumstance, we will allow that. In fact, what happened was you didn't answer at all. How does that fit with effectuating the right that you claim was the whole purpose of the contractual language? That doesn't square with the record, respectfully, your honor. My client responded on a timely basis, made clear what their position was from beginning to end. The fact that Is it sure? Are you saying that the record will reflect that every time the choice contacted EMS and said, I want to meet with this person or I have a question about that EMS responded each and every time? Is that your position? No, the record will reflect that my client typically responded in a timely basis to the inquiries and none of that, you know, that back and forth doesn't change in any way what the language of the contract was at all times. And the second thing, I was just like, the reason I was following up on that is because your argument was that you wouldn't have asked me if you, if you didn't already know the answer. And so if that's the key, if your evidence is this request, then isn't your evidence that your response in the record also evidence about what the contract says and means? I think that the answer to that is yes, your honor. I do think the responses that were given were likewise entirely consistent with it. As you know, from the record, occasionally permission was given for them to go out and do this second sourcing solicitation, but that in no way, shape or form ever varied the language in the contract. And the fact that this is so typical and ubiquitous in this industry, in the insurance industry and other industries, and the other side has no case that says that this type of an agreement is in any way void or unenforced, unenforceable is perhaps evidence that. Let me ask you about, so that you have an opportunity to get to the questions of what type of clause this is. Is this a condition subsequent? Is this actually a penalty clause? I think that flows in to your claims about what happened here. The level of, I know you've given us numbers of your claims of improper action. And also you've said that there were like 70 issues, times in which there was an impropriety. Does the value of that loss, I'm sorry, can you hear? Is that Judge Batchelder? I thought Judge Batchelder, did you have a question? No. Okay. Sorry. I'm sorry. I just, my question has to do with whether in fact the level of that breach argument that you're making has something to do with whether this might be a penalty versus a condition subsequent. And maybe you can begin by telling us what was the first time you raised the argument before the court regarding a condition subsequent. So let me be clear about that. I know what you're getting at. First of all, I see that my time has expired. May I have an opportunity to respond to your honor? So let me start with the last part first. This was a bench trial and during a bench trial, at the conclusion of the bench trial, Judge Gwynne asked for proposed findings of fact and conclusions of law. And I don't know when else we would raise some of those legal points, perhaps better than when we put them in our findings of fact and conclusions of law. So I truly, just the old, the old-fashioned way, the old-fashioned way, and maybe they don't do that anymore. I've been out a long time. The old-fashioned way is in your pre-trial brief or in your motion practice. You would have already said to the court, here's our defense. This is a condition subsequent, your honor, and we're going to prove it at trial. We made clear from beginning, this is whether, I don't know about the semantics, but whether it's condition subsequent or whether it is a condition. We made clear that these were bilateral mutual promises. If you want to get residuals, if you want the residuals to continue, you have to honor the non-solicit. Conversely, if you honor the non-solicit, my client is obligated to pay those residuals. There is nothing inappropriate about that. We made it clear that those two conditions of the contract were, we believe, valid and enforceable. We said it from the very get-go. We said it when we filed our complaint. We said it when we gave our opening statement. We said it throughout trial. As the case law recognizes, and I'll finish here, your honor, assuming I've responded to your question, they can say it a bunch of times. Judge Gwynne agreed with them. It was actually the flip of that. It was them agreeing with Judge Gwynne. They never even raised the issue that it was invalid as a liquidated damages provision or a penalty, but the case law has held that these types of provisions are neither of those. They're neither liquidated damages nor are they penalties. They are conditions in a contract. They are bilateral promises. They are allocation of risk. What is your best case to show that this is a condition subsequent? Well, my best case to show that this is a condition subsequent, of course, you narrowed it there, Judge, is the Ralston v. Nationwide case, which says, contrary to appellant's assertions, the non-competition provisions in this case were neither liquidated damages nor penalties, but mere conditions subsequent. A condition subsequent is any fact, the existence, or occurrence of which, by agreement of the parties, operates to discharge a duty of performance after it has been absolute. That fits like the glove. Well, here's the problem, counselor. The rest of that case says that a condition subsequent is generally not a clause that imposes damages for conduct that constitute a breach of contract, and there's no question here that your argument is that Choice's breach of contract is the basis of your claims. Doesn't that portion of Ralston undercut your argument? No, I don't believe it does, Your Honor, and I'd also commend the court's attention to the Process America v. Synergy case, the Second Circuit 2016 case, where the court held that a processor and a sales agent, just like here, that's exactly what we're talking about here, were free to negotiate a non-solicit, including the terms of the residuals, survival or termination, dependent on that. So, whether you call it a condition subsequent or simply two mutually enforceable bilateral promises in a commercial contract, either way, under any analysis, this language, again, is clear and declarative on its face. It is entirely consistent with the law. Parties are allowed to enter into these agreements. Parties do this every day of the week in this and many other industries, and there's nothing wrong with it. I think your time is up, Counselor. Let me ask Judge Batchelder, do you have any other questions for Judge Murphy? Nope, I do not. Okay, we thank you for your argument. Thank you, Your Honor. Counselor? You're mute. Am I on now? Yes, thank you. My apologies. May it please the court, I'm Tom Kovach. I represent affilies, plaintiffs, Infinity Capital LLC, who we often refer to as Choice, and John Paul Galino. This was a business dispute, which the court determined according to Ohio law. The parties really don't have a great, other than really this condition, subsequent issue, the parties didn't really disagree much about the Ohio law. It was really an issue of how the facts were to be applied to Ohio law in order to determine the dispute. On appeal, the district court's determination of the facts can be disturbed only if the clearly erroneous standard is met. Well, that's not true. If we find that the contract is clear and unambiguous, wouldn't that be de novo? The question of whether the contract is unambiguous? Yes, I was referring to the fact determinations only. I'm sorry, Your Honor. That's a legal determination that is de novo. Would you also agree that it's de novo review on whether the, whether you call it a condition subsequent or a penalty, what that thing is and whether it's enforceable? That strikes me as de novo review as well. Yeah, that's a good question. I have not asked the conditions of subsequent. It seems like it's a legal question of Ohio contract law. Yes, I would say yes, it is. In the first instance, certainly. Can I ask you just getting to the nuts and bolts of the contract? When I think of the rule against superfluity, it's a way to resolve ambiguity in the contract. And so if one provision is read out of the contract, that gives you a reason to read it a different way. But I'm struggling with what the district judge did here because he didn't find 4.11 ambiguous. He just immediately said 4.12 is superfluous no matter what, and then just kind of read 4.11 out of the contract. I'm struggling with what is your interpretation of 4.11, the service provision that actually gives it meaning independent of 4.12? I believe it's a poorly drafted contract. And I think the judge looked at it and found it to be 4.11 out of the contract. Essentially saying, these things are superfluous. I'm going with 4.12. I guess my instinct would be the rule superfluity is a way to resolve ambiguity. I find 4.11 to be plain and unambiguous. I don't even know that it triggers the rule against superfluity. The idea being it's a tiebreaker. It's designed to resolve ambiguities. There's nothing that the district judge pointed to in terms of 4.11 being ambiguous. It was just unambiguous, but the result is it largely eliminates 4.12. But I think the plain text reading is the preferred reading then rather than just obliterating a clause. But I would say, and vice versa as well, that if you're going to give effect to 4.1, you're reading 4.2 out of it. Because 4.12, on its face, it says attempt. That 4.11 doesn't say attempt. There's two verbs. There's a solicitor attempt. I could see an idea that because that is the core harm that is regulating the parties, they wanted to have an extra provision that not only prohibited solicits, but even prohibited attempts to solicit. And that has meaning independent of 4.11. Well, I think that was never a proffered meaning. The only proffered meaning from the appellant was this idea that it clearly meant that it was a non-disparagement clause. And there's nothing in the text of 4.12, subsection 2, which indicates that this was a non-disparagement clause. This industry has plenty of non-disparagement clauses in their contracts. They're separately set out like in most other industries. There was no textual support for the reading they were offering. Okay. Well, I'm thinking in my head just the rules for interpreting statutes. And I think by and large, they're the same for the rules for interpreting contracts. What's your best Ohio case on the rule against superfluity that would suggest that it means something other than what I suggested, which is if language is ambiguous, you read it in a way that makes other language have meaning and not we're going to part from the plain language out of concerns that the plain language reads something else out of the statute. Well, we cited State v. Porterfield and Hillsborough v. FOP. I don't know how to answer your question other than that, Your Honor. Well, I think we are all struggling with how these two provisions fit together. I would be interested in hearing in general what your understanding was because my struggle was less one is clear and the other one isn't. And so we choose the clear one. My struggle was that if you read the two together, it's that togetherness that creates ambiguity. Because in one, it's saying the old 2010 contract, you don't get to solicit anybody. But two is saying, here's the times that we will allow you to solicit. There's either an ambiguity because those are contradictory or the language must mean the language that was negotiated for the purpose of allowing them to represent other people must partake of meaning in section two. I think it's a very confusing contract and I would like you to stand back and tell me how you understood this analysis, whether it was independent review or whether there was ambiguity from the relationship between one and two. Well, in terms of the legal issue of the ambiguity, I think the court looked at it and was presented with competing interpretations by both parties and said, I can't get there without moving on to the extrinsic evidence. I think that's where the entire contract came about because of an inquiry from my client to EMS, the appellant saying, hey, I am going out on my own and I want to do secondary sourcing for your merchants as a part of that. And let's see if we can agree to some sort of a contract whereby that can be done. And that is where in return, EMS came up with the contract which had the new reduce or discontinue language. Now, by way of background that's clear on the record below, this part of the industry, this segment of the industry is high risk merchants. It's a very small segment of the industry and EMS had only recently gotten into it as had my client. And the issue is in that industry, the merchants use three, four, five, six different processors. Many of the agents out in the field represent two, three, four different entities like EMS, the payment processors. Because of caps? I'm sorry? Solely because of caps, the caps to the amount of money that can be serviced by individual servicers. That is the primary issue is that the caps are imposed by the lenders to limit their own risk. There's other issues as well. Merchants might be concerned that a bank that's behind one of these processors might terminate them. So they have what they call immediately turn to and they won't be turned off. So that's the background against the backdrop against which the judge, the district court assessed this. It seems like that super fluid idea is also in the 2010 contract. So I guess I have a hard time seeing why the subtle verb changes. If everybody agrees that the 2010 contract didn't allow for any type of solicitation of EMS customers outside of, even if it didn't reduce numbers, the super fluid idea was still in the 2010 contract because it had the same structure of one provision that said services or teaching or whatever. And then it had this other provision that said you can't solicit to terminate. And then all it really did was change terminate to reduce or discontinue. And we know, I guess it's extrinsic evidence, but we know from the record that your client's lawyer tried to put in the language at the end of that clause on that clearly would allow for solicitation. But I have a hard time seeing how the change from terminate to reduce or discontinue would somehow change the meaning of those two provisions to now allow for solicitation of EMS customers. Well, you mentioned the fact that my client's attorney tried to add additional language. There were efforts to make this more clear than simply reduce or discontinue, but they were all rejected by EMS. Now EMS, they added the reduce or discontinue language. They have said that they had revised their agreement to include it, but it fit perfectly in terms of the request from my client, which was, I want to do secondary processing to your merchants. The other circumstantial issue, one of several, but support this was that my client's, the 2010 agreement was going to terminate of its own terms. The only reason my client negotiated this new agreement was to get this right to do more secondary sourcing. He agreed to a lower residual amount. They, in turn, removed the exclusivity and he got the right to do the secondary sourcing. Isn't that one argument you could make though, he did get something out of this change. He got the, what I guess was the right to first refusal. Was that the exclusivity provision that was now out of the contract? And so that accomplished something independent of whether he was also allowed to solicit EMS customers that allowed him to solicit non-EMS customers for the first time. Well, the broader point though, was that the contract was going to terminate of its own terms. So his option was either to walk away and they EMS would continue paying him residuals and he would not be able to provide secondary sourcing to EMS merchants or renegotiate a deal with them, with the appellant, where he could continue to provide services to them, but also get the right to do this secondary source processing. So to get that he gave up, he paid off a loan obligation that he had to the appellant and he agreed to a lesser residual amount than he had been getting. So there was real consideration that was changed here, changed hands here in order to give my client the ability to do this secondary source processing to EMS merchants. I have one question on the comparison between the two also. The original 2010 contains the language that says you can't attempt to solicit any EMS customer for training support or other purposes approved in writing by EMS. Now the approved in writing part is not in the revised version. Is that where the confusion came with requests back and forth about approvals to do some solicitation? There was discussion at various points about incorporating into the new written approval, but that went by the wayside. It never made its way into the new agreement. And as you note, that other language was brought from the 2010 agreement. If you look at how these things played out, it sort of puts a lie to the idea that he was expected every time he solicited someone to seek approval, because in the cases where he did actually come to them and say, look, I want to play something with this particular merchant. Here's the reason why. In those cases, the solicitation was already done, and they knew that. I mean, he had already talked to the merchant who had come through one of his agents, and now it was simply a matter of, will I take this merchant on? Now, there were certain types of situations where my client believed there was no doubt that under their revised agreement, he was entitled to do this sort of secondary processing. But then others came up, which he wanted clarification on, because there's a lot of different iterations that come up. One could be somebody who EMS has already been placed there by another subagent, and they're seeking additional processing. Another can be one where he placed the merchant with EMS, and now the merchant is seeking additional processing from him. Or it could be one where he is now placing two at the same time. So he did go back to them on numerous occasions for clarification, but there was always a clear understanding that he was at a base level entitled to do secondary source processing. Go ahead, Judge Murphy. I was just going to ask briefly about the penalty provision, if that's okay. So I just did a nationwide search on analogous things, and it seems like some states treat these things differently. It seems like they come up most often in the employment setting, when maybe a longstanding individual retires, there's a cash payment that's guaranteed to the individual as long as the individual doesn't go work for a competitor. And that doesn't strike me. I mean, lots of courts have upheld it. I saw one Seventh Circuit case that suggested the majority rules that those types of things are okay. If they're okay in the employment setting, given the kind of employer-employee bargaining power differences, why would we say that they're not okay in the context of what is more like two businesses bargaining, two sophisticated corporations? Well, putting aside the subsequent argument that they're making, if I look at a high level, okay, at a higher level, we're not here attacking this clause on its face. What we're saying is that as applied in this instance, that a 100 to 1 ratio of penalty to actual damages puts us over the line into unconscionability. So it's a penalty in our case, but we're not saying that every single time this clause would have to be read that way. You could have an agent who has a $200,000 residual who poaches a $2 million client, in which case the penalty won't be close. The damages of taking the residual clause won't come close to making the payment processer whole. It's really fact-intensive. And I would also mention the process- Why couldn't we say that it almost is, like, it's giving you flexibility because you could either, excuse me, the person who's subject to the solicitation clause, because it's almost like efficient breach theory, you can determine for yourself, am I better off if I solicit and potentially generate this amount of money, or am I better off not soliciting and getting this income stream? It seems like if we don't enforce that, if we say that that's not enforceable, that's limiting flexibility of people in that potential circumstance to make that choice, because the I'm not attacking the language of the clause itself. I'm not saying that those can't be freely entered into. I'm saying in operation, when they're as manifestly unconscionable as this, then there's definitely a bright line that's been crossed. Are there any further questions? No. Thank you for your argument. Thank you. I think we'll have rebuttal. Thank you, Your Honors. Just a few quick points. This is an efficient breach type situation. He has a business decision to make. Clearly, he made the business decision here to go out and solicit the merchants. He knew the consequences of them. And again, he now has obtained through litigation that which, as the court has pointed out, he was not able to obtain through contract negotiation. Counsel says that they're not attacking these clauses, but the truth is that when it comes to 4.1 Romanette 1, the trial court obliterated the clause. The trial court likewise obliterated the agreement between these two parties and declared it a penalty that residuals, in order to continue, required ongoing adherence to the non-solicit. And I would just say this respectfully, Judge Strach, I hear you. I think that reasonable minds can look at a contract. Counsel, my very worthy adversary, jumped on that and said, well, I think this is a poorly drafted contract. I respectfully disagree. But even if I concede the point and go with your observation, well, there's overlap between the two. Overlap between two provisions in a contract does not ambiguity make, does not inconsistency make. And there's no rule of contract interpretation that suggests otherwise. I would just like you to help me understand then what it could mean. Because Roman numeral one says you cannot solicit for any purpose other than training and support, period. Or you may solicit or attempt to solicit any EMS merchants to reduce or discontinue their merchant processing services relationship with EMS. It's not, it's overlap. It's that the first one does it all. And the second one leaves, I'm concerned about the ambiguity with the second one. In the context of a negotiation to allow those solicitations, how can that have any meaning? They are easily harmonized and easily reconciled in my book. I do recognize that there is some redundancy between the two of them. But the first one is solicitation. You know, this circuit, you know, it's well recognized that legitimate reasons exist to uphold non-compete covenants and non-solicit covenants. And that is where they are going out and soliciting a customer saying, hey, come do business with me. The second one, which again comes in through parole evidence, the second one is implicated when they're out doing something that causes that merchant to question its business relationship with EMS and causing that merchant to think maybe I should reduce or discontinue my merchant processing relationship with EMS, even if it is not accompanied by a direct solicitation by choice. And here's the only point, even if it's not a model of clarity, there's nothing that's a very high standard. And I respectfully submit one that this court should decline to adopt in the Sixth Circuit, where you have to be absolutely perfect in your language according to three judges. Again, I submit this is good lawyering, this is good writing. I had no difficulty, I know I'm not the arbiter here, but I had no difficulty in understanding it. It would not counsel my client to do either what's expressly prohibited by 4.1 Romanet I or Romanet II. And the fact that they got it and understood it is made perfectly clear by the post-contract conduct and back-and-forth exchanges between choice on the one hand and EMS on the other. If I might, I really want to talk about damages. I think I can do it in about 15 seconds, Your Honor. My red card is that. That might be a litigator's 15 seconds. I'll do my very best. Look, it's really important because we were the victim here and we wound up with a whopper of a verdict against us. And we submit that when the court went out to calculate its damages, it resulted in an award of more than choice was seeking. And there's no pushback on that. And it actually put choice in a better position than if the contract hadn't been breached, which is the antithesis of what contract law is supposed to do. Just by way of a small example, because time is limited, the low risk present value discount rate of 2% approximately used by the trial court was something we never even had a shot at discussing at trial. It was never discussed at trial. And certainly, that low rate discount rate, that low percentage discount rate would apply to a high risk portfolio like this that has incredibly high turnovers. So in light of that, we would respectfully ask that the court reverse and vacate the court's order regarding enforcement of this contract and enforce it as written, enter judgment in EMS's favor in the amount of $981,000. Alternatively, if you don't see it our way on that, we respectfully ask you to reverse on damages and simply order that the proverbial spigot be turned back on, that the residuals simply be reinstated, reconciled, and paid based on actual revenue that was received by my client, which was all that was ever contemplated by this contract in the first place. Thank you very much. We thank you both for your arguments. The case will be taken under advisement, and we will render an opinion in due course. You may call the next case.